UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

DONALD OATIS                                            CIVIL ACTION

VERSUS                                                  NO. 09-3267

DIAMOND OFFSHORE                                        SECTION "N" (2)
MANAGEMENT COMPANY

## ORDER AND REASONS

Before the Court are the following: (1) the Motion to Limit Expert Testimony and

Report of Plaintiff's Expert Economist, John Gardner, Ph.D. (Rec. Doc. 26); and (2) the Motion

in Limine to Exclude Evidence of Plaintiff's Purported Inability to Manage his Finances (Rec.

Doc. 54). These motions are both opposed. (See Rec. Docs. 43, 60, and 74). After considering

the memoranda of the parties and the applicable law, the Court rules as set forth herein.

## I.      FACTUAL BACKGROUND

Plaintiff, Donald Oatis, is a seaman who was allegedly injured while working on the

mobile offshore drilling unit, the Ocean Drake, on February 5, 2008. The accident occurred

while Oatis was offloading pipe from a boat onto a pipe rack. Oatis was allegedly injured when

the crane operator swung a load of pipe, causing him to back up and fall four feet onto a metal

basket below the pipe rack.

## II.    THE MOTIONS

### (1) Motion to Limit Expert Testimony and Report of Plaintiff's Expert Economist, John Gardner, Ph.D. (Rec. Doc. 26)

In this motion, Diamond Offshore Management Company ("Diamond") requests that this Court limit the testimony of Plaintiff's expert economist, John Gardner, Ph.D., on the following grounds: (a) that certain of his economic projections are outside his permissible recovery for Plaintiff; (b) certain of the opinions expressed in Dr. Gardner's report are based on pure speculation and insufficient evidentiary basis; and (c) Dr. Gardner's methodology does not fall within the guidelines set forth in *Culver v. Slater Boat Company*, 722 F. 2d 114 (5th Cir. 1980), *cert. denied*, 469 U.S. 819 (1984).

Diamond objects to several items discussed in Dr. Gardner's November 6, 2009 report (Exhibit A to Rec. Doc. 26):

### (a) Dr. Gardner's Calculations for Fund Management and Account Management

Based on the report of Cornelius Gorman, Ph.D., Plaintiff's vocational rehabilitation specialist, Dr. Gardner has included, as part of Plaintiff's economic loss, calculations concerning the costs of "ongoing professional support in the management of his funds, as well as accounting and case management." (Exhibit A to Rec. Doc. 26, p. 3). To calculate this, Dr. Gardner uses a 1.5% declining fund balance fee and a $4,000.00 annual accounting and case management fee to run from the trial date to when Plaintiff reaches age 65.  Reduced to present value, the account management fee is estimated to be $129,573.00 and the present value of the fund management is estimated to be $525,847.00.

Diamond asserts that Plaintiff's alleged back injury during his employment with Diamond in no way can be considered to have had any impact on his intellectual functioning or cognitive

abilities. In other words, Diamond contends that any problem Plaintiff may have in managing money was with him well before this incident or his employment with Diamond. Diamond asserts that this evidence is irrelevant and should be excluded. At a minimum, Diamond claims such calculations for fund and account management are highly speculative.

In opposition, Plaintiff notes that his vocational rehabilitation expert, Dr. Gorman, concluded that Plaintiff is "mentally handicapped ... not literate and relies upon others for translation of most written materials ..." (Exhibit 1 to Rec. Doc. 43). Plaintiff argues that it is irrelevant that he sustained injuries to his back and not his head. In other words, Plaintiff contends that it does not matter that his accident is not the cause of his mental incapacity because a defendant takes his plaintiff as he finds him (i.e., the "egg shell plaintiff" theory).

While the Court is obviously aware of the "egg shell plaintiff theory", it has never seen this theory applied in this context, and Plaintiff has offered the Court no jurisprudential support therefor. Plaintiff's mental incapacity was not caused or exacerbated by any action of Diamond, and therefore, this cannot be used to increase the monetary damages Plaintiff seeks from Diamond. Thus, for all of the reasons stated by Diamond, its motion in this regard is granted. Such evidence/testimony is irrelevant and shall be excluded.

### (b) Inadequate Evidentiary Support for Dr. Gardner's Work Life, Future Growth Rate Retirement Match and Lost Meals

Diamond complains that Dr. Gardner assumes that Plaintiff will work as a floorhand in the offshore oilfield until he reaches the age of 65 and legally retires. Diamond argues that there is no evidence cited that Plaintiff intends to work until age 65 and no evidence that this is the normal retirement age for a floorhand employed by Diamond. In opposition, Plaintiff claims

that, at trial, he will testify that he intends to work until his social security retirement age of 65 . The Court finds that such evidence/testimony should not be excluded and denies Diamond's motion in this regard. Of course, Diamond may cross-examine Plaintiff on his intentions and may present its own work life expectancy figure. Essentially, this is an issue that the jury will decide based on the weight of the evidence.

Next, Diamond asserts that Dr. Gardner uses an insufficient evidentiary basis to project Plaintiff's wage growth rate. In arriving at a figure, Dr. Gardner looks at wages for sailor and marine oilers between the years 2003 and 2008. Plaintiff was employed as a floorhand on an offshore oil rig. Diamond complains that there is nothing to substantiate that Plaintiff's wage growth rate in this position would be equivalent to that of a sailor or marine oiler. Diamond asserts that Dr. Gardner should have focused his inquiry on wage rates in the affected industry, the offshore oil and gas drilling industry. In opposition, Plaintiff notes that Dr. Gardner utilized the Department of Labor wage category as being the one most similar to Plaintiff's offshore employment. The Court finds that such evidence/testimony shall not be excluded, and Diamond's motion is denied in this regard. Any challenge by Diamond to this methodology is a matter for cross-examination.

Diamond also claims that Dr. Gardner states, without support, that Plaintiff was enrolled in Diamond's 401(k) program and that he will suffer a loss of Diamond's employer match to that program in the amount of 15% of Plaintiff's annual pay. Diamond argues that there is no support for this figure; in fact, the Diamond "match" amounts to 100% of every pretax dollar up to 6% of a worker's pay. ( Exhibit B to Rec. Doc. 26). Thus, Diamond claims that Dr. Gardner should be prohibited from testifying regarding an employer match of 15% as unsupported and entirely

inaccurate. In opposition, Plaintiff notes that this percentage came from the Plaintiff himself. As for this issue, if it can be confirmed by evidence, other than Plaintiff's owns beliefs, that the percentage cited and used by Dr. Gardner is incorrect, the Court would expect that only the correct figure be presented to the jury; if not, the motion is granted as to this specific issue.

Last, Diamond argues that Dr. Gardner assumes that Plaintiff was supplied meals on Diamond's offshore drilling rig and that those meals were valued at $30.00 a day. Diamond claims that Dr. Gardner offers no support for this figure, and asserts that he should have looked to Diamond's cost to provide these meals, or, at a minimum, the industry's cost to provide offshore oilfield workers meals. Diamond cites *Cabahug v. Text Shipping Co., Ltd.*, 1998-0786 (La. App. 1st Cir. 5/12/00), 760 So. 2d 1243, *writ denied*, 2000-2366 (La. 11/3/00), 773 So. 2d 145 (economist projection of loss of "found"[1] at $18.00 per diem not allowed when no evidence of actual expense submitted). Diamond also complains that the projected loss of meals does not take into consideration that Plaintiff only is provided meals during his hitch, two weeks out of the month. Instead, Diamond notes that Dr. Gardner appears to project the loss over a full work year.

In opposition, Plaintiff notes that Dr. Gardner referred to several sources of information in this regard, including but not limited to the Federal per diem expense rate of $49.00 per day and an offshore helicopter pilots negotiated rate of $30.00 of expenses per day. Plaintiff argues that the issue here is the cost for Plaintiff to obtain similar prepared meals ashore, and not

---

[1] "Found" is an element of damages, which represents the value of living expenses provided to a seaman by his employer as a condition of employment while aboard ship. It usually includes expenses for food, lodging, and clothing. *Cabahug*, 760 So.2d at 1255.

Diamond's alleged expense for offshore production of meals.

While the Court determines that the proper price per day for meals may be discussed during cross-examination, the jury may not be presented with an estimate of a projected loss over a full year. Instead, the only relevant (and therefore admissible) evidence/testimony relates to the projected loss for meals provided during Plaintiff's hitch (i.e., for two weeks out of the month). Thus, Diamond's motion is granted in part and denied in part in this regard.

### (c) Dr. Gardner Did Not Use a Below Market Discount Rate as Required by *Culver II*

Diamond argues that there is no evidence that Dr. Gardner complied with the *Culver II* dictate to use a below market discount rate. Instead, Dr. Gardner uses a nominal increase of 3.92% (based on wage rates, not earning increases) in combination with a 2.66% discount rate - the effect of which is a negative net discount rate of -1.22%. Diamond contends that this gives a skewed presentation wherein Dr. Gardner's present value columns actually increase as times goes by, which essentially produces inflated loss figures. In sum, Diamond argues that Dr. Gardner's failure to observe the *Culver II* methodology makes his future economic projections of no value under existing law.

In opposition, Plaintiff notes that the Fifth Circuit has observed that *Culver II* did not mandate any specific discount rate and that parties are allowed to introduce expert opinion concerning the appropriate rate. The Court agrees with Plaintiff, and thus denies defendant's motion in this regard. The parties may introduce expert opinion concerning the appropriate rate; however, according to *Culver II*, the parties shall utilize the below-market discount rate method.

Thus, Diamond's motion to limit the expert testimony of Dr. Garner is granted in part and

denied in part.

**(2) Motion in Limine to Exclude Evidence of Plaintiff's Purported Inability to manage his Finances (Rec. Doc. 54):**

In this motion, Diamond requests that the Court exclude all evidence, whether by testimony or exhibit, that Plaintiff purportedly is mentally incapable of handling his own finances. This motion seeks to expand the prohibition against addressing this topic so that it may not be mentioned in opening argument or by any witness, including expert witnesses, before the jury.

Diamond notes that Plaintiff is a 39-year-old male who left formal education beginning in the tenth grade and has held various positions as a laborer, farmhand and poultry plant worker before becoming employed in the offshore oilfield for the majority of his past work life. Prior to the incident in suit, Plaintiff worked for Diamond for 10 years receiving promotions up to the floorhand level. Plaintiff has acknowledged that several years before his alleged injury, he started his own lawn service in Hattiesburg, Mississippi. Diamond claims, "[w]ithout basis, plaintiff's experts have painted him as a rube or a patsy. This is totally unjustified and ultimately a disservice to plaintiff." (Rec. Doc. 54, p. 3).

In opposition, Plaintiff notes portions of the reports of Dr. Gorman (Plaintiff's vocational rehabilitation expert), Dr. Bell (Plaintiff's neuropsychologist), and Dr. Greve (Defendant's neuropsychologist) which discuss Plaintiff's purported intellectual limitations. (See Rec. Doc. 60, pp. 1-2). Plaintiff asserts that the opinions of Drs. Gorman, Bell and Greve provide the foundation necessary to support the opinion that he will require assistance in managing his funds; and the fact that Plaintiff is mentally handicapped and illiterate supports the inability of

plaintiff to manage his own funds. Also, Plaintiff asserts that it does not matter that his accident did not cause his intellectual functioning limitations because a tortfeasor takes his victims as he finds them and must bear the responsibility for fully compensating an injured plaintiff.

For the reasons stated herein relative to Dr. Gardner's calculations/opinions relative to fund and account management, Diamond's motion is granted. It is uncontested that any problem Plaintiff may have in managing money existed well before this incident or his employment with Diamond. Because Diamond did nothing to cause Plaintiff's alleged intellectual limitations including his alleged limitations relating to money management, evidence/testimony and any item of recovery related thereto is inadmissible.

## III.    CONCLUSION

Considering the foregoing, **IT IS ORDERED** that the **Motion to Limit Expert Testimony and Report of Plaintiff's Expert Economist, John Gardner, Ph.D. (Rec. Doc. 26)** is **GRANTED IN PART and DENIED IN PART**, as expressed herein.

**IT IS FURTHER ORDERED** that the **Motion in Limine to Exclude Evidence of Plaintiff's Purported Inability to Manage his Finances (Rec. Doc. 54)** is **GRANTED**.

New Orleans, Louisiana, this 22nd day of March, 2010.

**KURT D. ENGELHARDT**
**UNITED STATES DISTRICT JUDGE**